Filed 2/24/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MAIRA E. DUARTE JUAREZ,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>DAVID S. WARD,<br><br>     Defendant;<br><br>THE ACADEMY OF MOTION PICTURE ARTS AND SCIENCES,<br><br>     Intervener and Respondent. | B313272<br><br>(Los Angeles County Super. Ct. No. 20STCP02070) |

     APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed.

     Law Office of Benjamin G. Ramm and Benjamin G. Ramm for Plaintiff and Appellant.

     Quinn Emanuel Urquhart & Sullivan, Christopher Tayback, Michael L. Fazio, Daniel C. Posner and Sage R. Vanden Heuvel for Intervener and Respondent.

A judgment creditor seeks delivery of her debtor's Academy Award statuette, commonly known as the Oscar, under the Enforcement of Judgments Law (EJL). (Code Civ. Proc., § 680.010 et seq.)[1] Respondent Academy of Motion Picture Arts and Sciences (AMPAS) intervened in the litigation. The EJL allowed the trial court to determine if AMPAS has a right to property (the Oscar) that came to light in a debtor's examination. (§§ 708.110, 708.180, 708.190.)

The court did not abuse its discretion by denying the creditor's request for delivery of the Oscar. It correctly found that AMPAS has the right to purchase the Oscar for $10 pursuant to a written agreement with the Oscar winner and AMPAS's bylaws. No trial was required. We affirm.

**FACTS AND PROCEDURAL HISTORY**

In 1974, defendant David S. Ward was awarded the Oscar for his work on the film The Sting. He signed a "winner's agreement" (Agreement), as required by AMPAS's bylaws. As an AMPAS member, Ward is bound by its bylaws.

The Agreement reads: "I hereby acknowledge receipt from you of replica No. 1659 of your copyrighted statuette, commonly known as 'Oscar', as an Award for Best Story and Screenplay - The Sting'. I acknowledge that my receipt of said replica does not entitle me to any right whatever in your copyright of said statuette and that only the physical replica itself shall belong to me. In consideration of your delivering said replica to me, I agree to comply with your rules and regulations respecting its use and not to sell or otherwise dispose of it, nor permit it to be sold or

---

[1] Undesignated statutory references in this opinion are to the Code of Civil Procedure.

2

disposed of by operation of law, without first offering to sell it to you for the sum of $10.00. You shall have thirty days after any such offer is made to you within which to accept it. This agreement shall be binding not only on me, but also on my heirs, legatees, executors, administrators, Estate, successors and assigns. My legatees and heirs shall have the right to acquire said replica if it becomes part of my Estate, subject to this agreement."

In 2020, appellant Maira Duarte Juarez obtained a judgment against Ward for unpaid wages and penalties. She served a demand for a debtor's examination. (§ 708.110.) At the examination, Ward disclosed that he has an Oscar but few other assets. After the examination, Juarez obtained a court order for delivery of movie memorabilia—a baseball bat signed by the cast of the film Major League. (§ 708.205.)

Juarez also applied for an order to deliver Ward's Oscar for public sale. (§ 708.205.) The court asked the parties to brief whether the Oscar can be sold. Juarez argued that the Oscar is Ward's personal property and primary asset, and any restriction on its sale does not bind her, as a judgment creditor.

AMPAS sought to intervene in this case when it learned of Juarez's efforts to seize the Oscar. AMPAS's Chief Financial Officer Andy Horn declared that the Oscar is a copyrighted work of art; it represents the pinnacle of professional recognition in the film industry and is unavailable to the public. Since 1951, AMPAS's bylaws mandate that a member who receives an Oscar must afford AMPAS a right of first refusal to purchase it if it is to be sold or disposed of. Receipt of an Oscar is conditioned on execution of the Agreement, which Ward signed in 1974. AMPAS

3

informed Ward and Juarez that it is asserting its right to purchase Ward's Oscar for $10.

The court gave AMPAS leave to intervene, allowed Juarez to propound discovery on AMPAS, and ordered the parties to brief their claims. Before the court could rule on the claims, Ward returned the Oscar to AMPAS and was paid $10. Juarez argued that AMPAS "should be able to keep its statuette. It also must pay the judgment . . . because property subject to a lien 'may be proceeded against and either sold or sequestered, and its proceeds paid to a person in whose favor the lien exists.' "

## THE COURT'S RULING

The court found that Ward's Oscar is subject to an equitable servitude, under the Agreement and AMPAS's bylaws. The servitude requires Ward to offer AMPAS the Oscar for $10 before selling or disposing of it by operation of law. Conveying the Oscar for Juarez's benefit is "disposing" of it by operation of law. Ward offered the Oscar to AMPAS to comply with his Agreement and membership obligations; AMPAS purchased it for $10 and now owns and possesses it. The court wrote, "[A]t this time, Plaintiff has neither sought delivery of the Oscar from the Academy nor has [she] argued that [she] has the right to do so."

A judgment creditor can demand the proceeds from the sale of a debtor's personal property. Juarez holds a lien on the $10 in proceeds from Ward's transfer of the Oscar to AMPAS. AMPAS acquired it through a valid contract and paid the amount it was contractually required to pay. Even if Juarez acquired the Oscar, it cannot be sold because of the equitable servitude. The court

4

ordered Ward to surrender the $10 in proceeds to Juarez. Juarez appealed the order.[2]

## DISCUSSION

### 1. Appeal and Review

The order arises after judgment in Juarez's labor law case against Ward. (§ 904.1, subd. (a)(2); *Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 544, fn. 1 (*Pim*) [an order to enforce a judgment after a debtor's exam is appealable].) When the court resolves competing interests in property, its "determination is conclusive as to the parties to the proceeding and the third person [claiming an interest], but an appeal may be taken from the determination." (§ 708.180, subd. (a).)

On appeal, Juarez addresses whether (1) the trial court was allowed to use a summary procedure; (2) the equitable servitude doctrine applies to chattels; and (3) the Agreement creates an equitable servitude on Ward's Oscar. "The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

### 2. The Court Properly Proceeded Under the EJL

The EJL "is a comprehensive scheme governing the enforcement of all civil judgments in California." (*Pim, supra,* 33 Cal.App.4th at p. 546.) Under this scheme, a lien is created on all nonexempt personal property when the debtor is served with notice to appear for examination. (*Id.* at pp. 552–553; § 708.110, subd. (d).) "Except as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money

---

[2] Ward did not file a responsive brief in this appeal.

judgment." (§ 695.010, subd. (a).)  However, "property of the judgment debtor that is not assignable or transferable is not subject to enforcement of a money judgment." (§ 695.030, subd. (a).)

Juarez demanded that Ward respond to requests for information about his assets.  After a debtor's examination (§ 708.110), she requested an order to have Ward's property applied to satisfy her judgment.  Under section 708.205, subdivision (a), the court may order the judgment debtor's interest in property to be applied toward the satisfaction of the judgment.  Juarez secured a signed order for movie memorabilia, but the court refused her request for the Oscar.

The court allowed AMPAS to intervene to claim a right to the Oscar.  Section 708.190 reads:  "The court may permit a person claiming an interest in the property or debt sought to be applied in an examination proceeding to intervene in the proceeding and may determine the person's rights in the property or debt pursuant to Section 708.180."  The purpose of this statute is to allow "the early resolution of a third-party claim to property that is the subject of an examination proceeding."  (Cal. Law Revision Com. com., Deering's Ann. Code Civ. Proc. (2022) foll. § 708.190.)[3]

These procedures are a " 'less expensive and less cumbersome' " way of enforcing a debt.  (*Evans v. Paye* (1995) 32 Cal.App.4th 265, 276.)  When a third party claims an interest in

---

[3] Juarez believes the trial court could not apply section 708.190 because AMPAS did not cite it in its request to intervene. That is not the rule.  " 'The general rule is that a trial court is presumed to have been aware of and followed the applicable law.' " (*People v. Shiga* (2016) 6 Cal.App.5th 22, 40.)

6

property adverse to the debtor or creditor, the court's resolution of the competing interests is conclusive. (*Id.* at pp. 277–280.) The EJL envisions that the court will make factual findings, without the need for a separate lawsuit. (*Id.* at pp. 278–282.)

A creditor's suit may be required *if* the court finds that the third party's claim is made in good faith *and* at least one of three conditions exists: (1) the court is not a proper forum for adjudicating the claim; (2) another action is pending regarding the third party claim; or (3) the court believes the claim should be tried as an independent suit. (§ 708.180, subd. (b).) The court did not find that any of these conditions exist.

When Juarez asked "to use post-judgment discovery procedures to investigate the Academy's claims," the court allowed her to conduct discovery; the parties briefed their competing claims to Ward's Oscar. (§ 708.180, subd. (a) [court may allow a continuance for discovery, production of evidence, or other preparation for the hearing].) Juarez asked the court to bar AMPAS from "purchasing the Oscar statuette out from under Ms. Juarez," citing section 708.110, subdivision (d). Juarez now argues that the court should not have followed streamlined procedures.

The EJL summary procedures were not "foisted" on Juarez, as she now argues; she acknowledges that she could have brought an independent civil action. (*Ilshin Investment Co., Ltd. v. Buena Vista Home Entertainment, Inc.* (2011) 195 Cal.App.4th 612, 626–627.) Juarez's regret that she pursued her remedies under section 708.110 et seq., instead of a civil suit, is not trial court error. Nor would an independent action necessarily have produced a different result.

Juarez argued below (a) there is no evidence that Ward is a member of AMPAS subject to its bylaws; (b) the bylaws do not bind third party creditors; and (c) even if the bylaws could restrict the rights of judgment creditors, she should not lose her right to collect on her judgment "simply because [AMPAS] *might* decide to offer a low price for an asset that can be used to satisfy a judgment. The Academy should be forced to buy the Award from the *Plaintiff* for $1.00 [*sic*] or allow the levying officer to sell it. At the very least, the Plaintiff is entitled to the $1.00 [*sic*]."

None of these issues required a trial. AMPAS's Horn declared that Ward is an AMPAS member since 1974, which Juarez does not dispute. Nor does Juarez dispute that AMPAS offered to purchase the Oscar under the Agreement. The legal issue of whether AMPAS's bylaws apply to a creditor's claim does not require a trial.

Later, Juarez argued that a trial was needed to determine if the Agreement and AMPAS's right of first refusal is a "reasonable" restraint on alienation. The court found the restraint reasonable when it wrote that AMPAS "acquired the Oscar based upon a valid contractual transaction" and if Juarez were to acquire it, she "would be unable to sell it, either herself or through a third party, because of the existence of the equitable servitude on it." Whether an equitable servitude may exist in personal property is a legal question that we discuss below.

### 3. Equitable Servitudes in Chattels

In the trial court, Juarez initially wrote that AMPAS's bylaw "appears to create a so-called 'equitable servitude' in personal property against an Oscar that was at any time awarded to an existing member that currently subscribes to the bylaws." She argued that the bylaw unreasonably destroys or impairs an

8

existing substantive right; it is premature to enforce an equitable servitude before AMPAS extends an offer to purchase the Oscar; and the bylaw is an unreasonable restraint on alienation. Later, Juarez argued that AMPAS's contractual right of first refusal does not eliminate her lien under the EJL; no equitable servitude was established; the restriction on sale is unreasonable; and AMPAS's payment of only $10 for the Oscar is a voidable transfer from an insolvent debtor. Yet she agreed that AMPAS "should be able to keep its statuette."

### a. *Equitable Servitudes*

The doctrine of equitable servitudes applies in California, which has "accumulated its own body of rules." (*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 353.) The doctrine makes enforceable, in equity, a covenant relating to property that might be otherwise unenforceable. (*Marra v. Aetna Construction Co.* (1940) 15 Cal.2d 375, 378–379; *Southern California School of Theology v. Claremont Graduate University* (2021) 60 Cal.App.5th 1, 8.)

### b. *The* Nadell *Case*

Most cases applying the doctrine of equitable servitudes involve real property. One California case, *Nadell & Co. v. Grasso* (1959) 175 Cal.App.2d 420 (*Nadell*), holds that equitable servitudes may be created in personal property.[4] A servitude may be enforced if personal property is subject to a written

---

[4] Property is either "[r]eal or immovable," or "[p]ersonal or movable." (Civ. Code, § 657.) "Every kind of property that is not real is personal." (Civ. Code, § 663.) Personal property includes "money, goods, chattels, things in action, and evidences of debt." (Civ. Code, § 14, subd. (b)(3).)

9

agreement imposing a reasonable restriction, and a later owner has notice of the restriction. (*Id*. at pp. 428–431.)

In *Nadell*, the plaintiff contracted to purchase damaged containers of Kraft fruit salad; as a condition of the sale, the plaintiff agreed to repackage the fruit salad before selling it to consumers. The defendant, a subsequent purchaser, refused to abide by the condition, resulting in the retail sale of physically damaged products bearing the Kraft name. (*Nadell*, *supra,* 175 Cal.App.2d at pp. 423–424.) The court enforced the restriction against the defendant, whose lack of privity with the parties who agreed to restrict sale did not make the restriction unenforceable. Instead, an equitable servitude was sustained on a theory that a producer of goods has a proprietary interest in the goodwill of its business. (*Id*. at p. 431.)

*Nadell* cites as precedent California Supreme Court cases underscoring business interests in protecting public goodwill in a product. (*Nadell, supra,* 175 Cal.App.2d at pp. 427–428.) The opinion cites cases from other jurisdictions that " 'enforced rights resembling an equitable servitude binding on a third party who has acquired personal property from one who is under a contract to use it for a particular purpose or in a particular way.' " (*Id*. at p. 428.)

The goal in *Nadell* was to enforce a restriction on sale to ensure the prestige and good name of the original producer of property. The goodwill of a business "is property" (Bus. & Prof. Code, § 14102) and "is not limited to the field of manufacturing." (*Nadell, supra,* 175 Cal.App.2d at p. 431.) "[I]t is sound public policy to protect" the interests of a manufacturer, producer, or distributor of a trademarked article "in the goodwill towards his product which he has created . . . against destruction by others

10

who have no interest in it except to use it in a misleading way." (*Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 455.)

Juarez argues that *Nadell* is wrongly decided—that only real property can be subject to an equitable servitude. She relies on Civil Code section 702: "The names and classification of interests in real property have only such application to interests in personal property as is in this division of the code expressly provided." Equitable servitudes—as the name suggests—are imposed by courts acting in equity. The doctrine does not arise from statute. (See *Nadell, supra,* 175 Cal.App.2d at p. 426 [rejecting a claim "that respondent failed to exhaust his legal remedies before recourse to equity"].) Civil Code section 702 does not bar AMPAS from asserting an equitable servitude.

> *c. Application of* Nadell *to Ward's Oscar*

In consideration of receiving the Oscar, Ward signed the Agreement promising to offer it to AMPAS before selling or otherwise disposing of it. As a member of AMPAS, Ward is bound by its bylaws, which oblige him to offer the Oscar to AMPAS. AMPAS has a right of first refusal to reclaim an Oscar before it can be transferred. If AMPAS declined to exercise its rights, an Oscar could be sold. Juarez had notice of AMPAS's right of first refusal, and intent to exercise that right, before she could take possession of the Oscar. *Nadell* does not require notice to the general public, only to the party who comes into possession of property subject to a constraint.

Juarez contends that AMPAS's right of first refusal is a presumptively void restraint on alienation, and that AMPAS did not show that the restraint is reasonable. In her view, the reasonableness issue presented a question of fact that could not be resolved summarily. Juarez acknowledges that AMPAS's

11

Horn declared that the restraint on Oscar sales benefits it and its members; however, he did not account for its effect on creditors and AMPAS failed to adequately answer discovery questions.[5]

The goal identified in *Nadell* for enforcing a reasonable restriction on alienation, in an unusual case, exists here. " '[A] court of equity will enforce a restrictive covenant, if it is reasonable and made within proper limitations.' " (*Nadell, supra,* 175 Cal.App.2d at p. 429.) "Reasonableness is determined by comparing the justification for a particular restraint on alienation with the quantum of restraint actually imposed by it." (*Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 498.)

Substantial evidence supports the trial court's conclusion that the restraint is reasonable. AMPAS's Horn declared that AMPAS "has spent millions of dollars to promote the 'Oscar' " so that "[t]he prestige associated with receiving an 'Oscar' is unparalleled by any other award of its kind." Each statuette is "one of a kind," not available to the public nor intended "to be treated as an article of trade." If Juarez places Ward's Oscar on sale, AMPAS and its members will be irreparably harmed by the diminution in value of all Oscars, the Academy Award ceremony, "and the prestige of the Oscar in general." Juarez did not refute this by presenting a contrary expert opinion.

An Oscar is conferred on those who earn it by dint of artistic talent that is rewarded by acclamation of peers in the film industry. An Oscar that is sold by a creditor, who did not earn the award, diminishes the honor of the achievement and the value of AMPAS's copyrighted statuette.

---

[5] Juarez did not ask to meet and confer about the responses or try to compel further discovery, forfeiting her claim of inadequate discovery.

### d. *Merger Doctrine*

Juarez contends that the merger doctrine extinguishes any equitable servitude. She cites Civil Code sections 805 and 811, which are in division 2, part 2 relating to "Real or Immovable Property." (Civ. Code, § 755 et seq.)[6] The statutes do not apply to personal property. Even if they did apply, the doctrine of merger means that the servitude was extinguished when AMPAS paid $10 and retook the Oscar. (See, e.g., *Rosebrook v. Utz* (1941) 45 Cal.App.2d 726, 728–729 [grantee's easement over a parcel was extinguished when the grantee became owner of the parcel].) Once AMPAS became the owner of the Oscar, Ward had no further interest in it; it cannot be seized, although the $10 Ward received for it can be.

### 4. Juarez Cannot Have Greater Rights than Ward

Juarez agrees that AMPAS has a right of first refusal but asserts that it can be enforced only against Ward, not against her. She does not dispute that Ward signed the Agreement, is bound by AMPAS's bylaws, or that he is subject to AMPAS's right of first refusal. In effect, she argues that her rights are greater than Ward's rights.

A judgment creditor's interest is derivative of the judgment debtor's interest: The creditor acquires only the interest a judgment debtor has in personal property at the time of the levy. (*City of Torrance v. Castner* (1975) 46 Cal.App.3d 76, 80.) "The

---

[6] Civil Code section 805 reads, "A servitude thereon cannot be held by the owner of the servient tenement." A servitude is extinguished when the right to the servitude and the right to the servient tenement merge in the same person; the servient tenement is destroyed; acts incompatible with the servitude; or disuse of the servitude. (Civ. Code, § 811.)

13

lien attaches to the real and not the apparent interest of the debtor." (*Henry v. General Forming, Ltd.* (1948) 33 Cal.2d 223, 225–226.) Because a judgment is a lien only on the interest of the judgment debtor, latent equities against the debtor may be asserted against his judgment creditor, who "is subject to all prior interests in the property, whether known or unknown, recorded or unrecorded." (*In re Mellor* (9th Cir. 1984) 734 F.2d 1396, 1401, fn. 4; *McGee v. Allen* (1936) 7 Cal.2d 468, 473.)

These legal principles thwart Juarez's claim to the Oscar. She is Ward's creditor, not his legatee or heir, and she plans to dispose of the Oscar by operation of law, at a public sale. But Ward is not allowed to dispose of the Oscar without first offering it to AMPAS, a restriction he agreed to as consideration for receiving the award. Moreover, bylaws of voluntary associations are binding contracts. (*Berke v. Tri Realtors* (1989) 208 Cal.App.3d 463, 469.) As an AMPAS member, Ward is bound by its bylaw restricting the sale of Oscars.

As Ward's creditor, Juarez is subject to the same restriction imposed by the Agreement and bylaws. Juarez had no greater rights than Ward. She admitted as much when she told the trial court that AMPAS "should be able to keep its statuette." Juarez writes that the Agreement is "a personal, contractual obligation between Mr. Ward and the Academy." It is unclear how Juarez has standing to assert that the Agreement is "repugnant to the interest created [and] void" (Civ. Code, § 711), when the person who signed it willingly complied with its terms.

Even if Juarez could force delivery of the Oscar, she and any subsequent purchaser would be subject to AMPAS's right of first refusal. The holder of a right of first refusal has the preference to purchase property that " 'is enforceable against

14

third persons entering into a contract to buy the property with notice of the holder's right.' " (*Hartzheim v. Valley Land & Cattle Co.* (2007) 153 Cal.App.4th 383, 389.) As previously discussed, AMPAS's right to reclaim the Oscar is reasonable to preserve its significant investment in the goodwill of its business.

## DISPOSITION

The order is affirmed. The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.